UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES KENDRICK,

        Plaintiff,                        CIVIL ACTION NO. 12-15388

     v.                               DISTRICT JUDGE GEORGE CARAM STEEH

                                       MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 16, 23)

Plaintiff Charles Kendrick challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 16, 23). Judge George Caram Steeh referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 4).

    I.      RECOMMENDATION

Because the Administrative Law Judge's ("ALJ") RFC properly incorporated Plaintiff's mental limitations, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

    II.     DISCUSSION

        *A. Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### *B. Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th

Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A. *Administrative Proceedings*

Plaintiff most recently applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") on October 29, 2009, alleging a disability onset date of March 31, 2006; the Commissioner denied the application (Tr. 26). Plaintiff appeared with counsel for a hearing before ALJ Regina Sobrino, who considered the case *de novo* (*Id.*). In a written decision, ALJ Sobrino found Plaintiff was not disabled (Tr. 26-36). Plaintiff requested an Appeals Council review (Tr. 20-22). On September 4, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-6).

Plaintiff had filed other applications for DIB and SSI (Tr. 26). Those claims were denied by an ALJ on February 24, 2009, and the ALJ's decision became the Commissioner's final administrative decision on September 15, 2009 (Tr. 112-14). Plaintiff did not appeal. The unadjudicated period before ALJ Sobrino thus began on February 25, 2009 (Tr. 26).

*B. ALJ Findings*

Plaintiff has a high school education and past relevant work as a machine operator, press operator, and stapler (Tr. 34). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since February 25, 2009, the first day of the unadjudicated period (Tr. 28).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative joint disease/rheumatoid arthritis,[1] chronic obstructive pulmonary disease/asthma,[2] depression, anxiety, and a history of alcohol abuse (reported to be in remission) (*Id.*).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 29-30).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to:

> [l]ift, carry, push and pull a maximum of 20 pounds occasionally and 10 pounds frequently. In an 8-hour workday, [Plaintiff] can stand/walk for up to 2 hours and sit for up to 8 hours, with typical breaks and a lunch period. He cannot climb ladders, scaffolds or ropes. He can occasionally climb ramps or stairs, and stoop. He cannot crouch, kneel or crawl. He should avoid even moderate exposure to extreme cold, fumes, odors, dust, gases or poor ventilation. He could not be exposed to hazards, or be required to operate foot or leg controls. He is limited to performing simple, repetitive

---

[1] "Osteoarthritis [, also known as Degenerative joint disease,] is the most common joint disorder, which is due to aging and wear and tear on a joint." *See* http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (last visited December 23, 2013). Rheumatoid arthritis is "a chronic systemic disease primarily of the joints, usually polyarticular, marked by inflammatory changes in the synovial membranes and articular structures and by muscle atrophy and rarefaction of the bones. In late stages deformity and ankylosis develop." *Dorland's Illustrated Medical Dictionary*, 152-59 (31st Ed. 2007).

[2] "Chronic obstructive pulmonary disease (COPD) is one of the most common lung diseases. It makes it difficult to breathe." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001153/ (last accessed December 23, 2013).

> work that does not involve more than 1- and 2-step tasks; and low stress work (*i.e.,* no fast-paced work, no work that involves quotas, and no assembly line work). He cannot work in close proximity to others, or perform work that involves more than brief and superficial contact with the public.

(Tr. 30).

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work (Tr. 34).

At step five, the ALJ found Plaintiff was not disabled, because he could perform a significant number of jobs in the national economy (Tr. 35).

### C. Administrative Record

#### 1. Plaintiff's Hearing Testimony and Statements[3]

Plaintiff last worked in March of 2006 (Tr. 48). He feels he can no longer work primarily because of his mental problems (*Id.*). He sees a psychiatrist at New Passages for depression, bipolar disorder, and panic disorder (Tr. 53, 56).

Plaintiff described his panic: he quickly goes from feeling fine to nervous and scared, as if something is about to happen (Tr. 55). But he could not identify anything in particular that triggers his panic (*Id.*).

Plaintiff has attempted suicide several times (Tr. 56). One such attempt was around June of 2009: he was hospitalized because he tried to commit suicide, and was subsequently transported to an adult foster care home (Tr. 47-48).[4] Plaintiff has been living there since; he

---

[3] Plaintiff's testimony before the ALJ reflects his subjective view of his medical condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

[4] "Adult Foster Care (AFC) homes are residential settings that provide 24-hour personal care, protection, and supervision for individuals who are developmentally disabled, mentally ill,

stays with two other people (Tr. 47). Last year, Plaintiff ended up in the emergency room at his case manager's urging: Plaintiff told him that he was feeling "really down, really sick, and [he] just . . . wanted to end it all" (Tr. 54).

Plaintiff's depression has improved since then, but it remains "bad enough to where [he] do[es]n't really feel like [he] can do anything"; so, he "stay[s] in bed all the time" (Tr. 56). Plaintiff goes to bed between eight and nine in the evening, and wakes up around 9:30 in the morning (Tr. 57); he spends most of his day lying in bed, though will leave to go to Alcoholics Anonymous meetings (*Id.*). He used to like spending time watching television, but now he cannot sit still long enough to watch anything; he no longer has much of an attention span (*Id.*). When he does watch a television show, he is not able to follow what is going on (Tr. 57). But, he reads often, something he did not do before; it helps him to take his mind off of other things (Tr. 56). Plaintiff does not like being around people (Tr. 59).

Plaintiff's legs also bother him a lot (Tr. 48). He began having leg problems approximately one year ago; his physician told him that they were caused by arthritis in both knees (Tr. 49). He walks a little bit every day, but no more than 20 minutes at a time; he cannot walk as much as he used to (Tr. 48). He does not require an assistive device (Tr. 49). He can stand for 30 minutes (Tr. 48-49). He was recently referred to a peripheral vascular doctor, and planned to see him later that month (Tr. 49).

Plaintiff also has a lung problem (he is trying to quit smoking); esophageal disease, which causes food to get stuck in his throat; and, alcohol dependence (Tr. 50, 54, 58). He goes to

---

physically handicapped or aged who cannot live alone but who do not need continuous nursing care." *See* http://www.michigan.gov/dhs/0,4562,7-124-5455_27716_27717-43059--,00.html (last accessed December 23, 2013).

Alcoholics Anonymous meetings every day – sometimes twice – but is on no related medications (Tr. 55). The last time he was hospitalized for substance abuse was July of 2008 (*Id.*).

Plaintiff has no trouble reaching or using his hands to hold things (Tr. 49) He does have trouble bending at the waist, knees, and crouching down; bending over to pull his pants on and tie his shoes; navigating stairs – by the time he reaches the top of stairs, he is out of breath; and, lifting heavy items bothers his back (he can lift up to 20 pounds) (Tr. 49-51). Plaintiff also has trouble sitting because he gets anxious: he can only sit for a little while before he feels that he must get up and do something (Tr. 49). Plaintiff's medications cause him some dry mouth and weight gain, but nothing "real major" (Tr. 52).

Plaintiff does not cook, clean, do laundry or similar chores because his foster home does not allow him to do it; but he sweeps the floor and driveway (Tr. 51). He does not shop for groceries or drive (he does not have a driver's license, though he can sometimes get rides arranged through his home) (*Id.*). He visits his parents on holidays, but because they live so far away, he does not see them nearly as much as he would like (*Id.*).

### 2.    Relevant Medical Evidence[5]

Plaintiff primarily treated at New Passages during the relevant time period. On March 26, 2009, Plaintiff presented as slightly depressed, with labile affect. He had been feeling down during the last week; did not feel like being around people; and, coped by taking walks with a friend. He did not think his medications were working, but did not feel as bad when he was taking them (Tr. 351).

---

[5] Only medical evidence relevant to Plaintiff's mental limitations during the unadjudicated time period – which began on February 25, 2009 – is discussed herein.

On April 9, Plaintiff had a stable mood and constricted affect; was talkative and responsive; and, reported that his medications were working – he sometimes felt "alright" (Tr. 352-53). On April 23, Plaintiff presented as depressed and fatigued, with a flat to sad affect. He felt up and down, worthless at times, and purposeless; was compliant with medications; and, coped by watching television and sitting in his room. He denied suicidal ideations and stated that he was "trying to feel very positive." He spent time with family over Easter and reported that it was a good experience, but he did not feel he could rely on family for support (Tr. 356).

On May 5, Plaintiff reported continued loneliness and depression; was resistive to outlets; only wanted to be by himself; and, denied homicidal and suicidal ideations. The therapist noted lack of support as a risk factor (Tr. 358-59).[6] On May 7, Plaintiff had depressed mood and labile affect, and reported feeling down about having no money and no job (Tr. 359-61). The therapist noted that "[Plaintiff] appears to need something to do during the day. He really wants to do some work that he is paid for but doesn't want to do anything to affect his Social Security disability appeal. He reports that doing some odd jobs make him feel better . . . [he] is constantly depressed. Moods are up and down. Suicidal ideations appear to have decreased but he did report . . . a passive thought two days ago. [He] copes by walking, being active, and going to therapy" (Tr. 359-61). On May 12, Plaintiff appeared alert and oriented; displayed flat affect; and, reported that his medications were working well (Tr. 362).

On June 17, Plaintiff presented with flat affect, "depressed/normal" mood, and calm motor activity; said he felt up and down, and lonely; and, had nothing to do, no transportation, and insufficient money for a bus pass – but, he was interested in volunteer opportunities (Tr.

---

[6] The other risk factors listed as options on the New Passages progress notes are medical health risks; command hallucinations; recent loss; fear of losing control; marked or severe ADLs; current substance abuse; fear of being controlled; and, unstable living environment (*e.g.*, Tr. 251).

387). On July 17, he felt very lonely and had little to do (Tr. 293). On July 20, he presented with a depressed mood with flat affect, calm motor skills, and normal speech; reported that he was feeling okay, but low on medications; and, exhibited no notable risk factors (Tr. 294-95).

On August 3, he presented with depressed mood, flat affect, and calm motor skills; he felt okay and was taking his medications as directed (Tr. 296-97). On August 11, Plaintiff's mood was stable, he had flat affect, and his conversation was reality based; he thought his medications were working well (Tr. 298-99). On August 19, Plaintiff presented with depressed mood, flat affect, calm motor skills and normal speech (Tr. 300).

On February 5, 2010, Matthew P. Dickson, Ph.D., completed a consultative psychiatric report for the state DDS (Tr. 393-96). Plaintiff reported that he was staying away from people (though he spent time with one friend at his AFC home); feeling depressed all the time; and, getting along okay with others, though he is very shy (Tr. 393-94). He spent most of his day lying in bed and thinking; enjoyed walking and watching TV; denied sleep difficulties; and, was independent in cooking, cleaning, laundry, self-care and personal hygiene, and counting money, but needed assistance paying bills (Tr. 493). Dr. Dickson noted that Plaintiff was socially appropriate and in touch with reality; engaged in good eye contact; had appropriate affect, slowed psychomotor activity, and a subdued emotional state; and, did not seem to exaggerate or minimize symptoms (Tr. 394-95). Plaintiff reported hearing noises once in a while, but Dr. Dickson did not find this to be diagnostically significant (Tr. 395). He reported four previous suicide attempts, most recently around 2008 (Tr. 395). Dr. Dickson diagnosed recurrent, moderate major depressive disorder and alcohol dependence in partial remission, and assigned a GAF of 54 (Tr. 395).[7]

---

[7] The GAF score is:

Dr. Dickson opined that Plaintiff was mildly impaired in his ability to understand, attend to, remember, and carry out instructions; and, moderately impaired in his ability to appropriately respond to coworkers and supervisors, and adapt to change and stress in the workplace (Tr. 396). Dr. Dickson concluded that his psychological condition would moderately impair his ability to perform work related activities (Tr. 396).

On February 11, Rom Kriauciunas, Ph.D., completed a consultative review and mental RFC for the state DDS: he concluded that Plaintiff was mildly limited in his activities of daily living; and had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace (Tr. 398-415). He stated that Plaintiff's functioning was adequate when not engaging in full blown alcohol use, and opined that he was capable of performing simple, repetitive work on a sustained basis (Tr. 410). With respect to Plaintiff's mental RFC, Dr. Kriauciunas opined that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the public; maintain socially appropriate

---

    a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x. 496, 502 n. 7 (6th Cir. 2006).

behavior and adhere to basic standards of neatness and cleanliness; and, respond appropriately to changes in the work setting (412-14).

On March 12, Plaintiff presented to Hurley Mental Health associates. He reported no motivation or ambition; low appetite; frequent sadness; and he was eating and sleeping in bed (Tr. 491). He asked whether a different antidepressant might work better (Tr. 491). On May 10, Plaintiff reported that his switch to Zoloft had not made a difference; he was sleeping okay; and, his appetite had been down (Tr. 492).

On August 22, Plaintiff was depressed about his living situation and being denied SSI (Tr. 704). On September 7, he did not feel so depressed anymore, was no longer sleeping all day, and was "getting out and doing things" (Tr. 704). On November 22 and December 6, Plaintiff reported feeling okay on his medications, and his therapist noted a normal mood (Tr. 706, 699).

On January 24, 2011, Plaintiff presented with flat affect, calm motor skills, and normal speech; he felt okay and was taking his medications; and, he was regarded as low risk (Tr. 697-98). On February 7, 2011, Plaintiff stated his depression had been up and down; presented with calm motor skills, stable affect, normal speech; verbalized medication compliance; and, was deemed low risk (Tr. 692-95).

### 3. Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could lift, carry, push, or pull up to 10 pounds frequently, and up to 20 pounds occasionally; stand and walk two hours in an eight hour workday; and, sit up to eight hours in an eight hour work day, with typical breaks and a lunch period (Tr. 63). The individual could not climb ladders, kneel, crouch, or crawl; could occasionally climb stairs and stoop; should not be exposed to hazards; and, should not have to

use foot or leg controls (Tr. 63). Work must not involve concentrated exposure to fumes, dust or gases, or exposure to extremes of temperature and humidity; be limited to simple, repetitive work that does not involve understanding, carrying out, or remembering more than one- and two-step tasks; and, be low stress, in that it did not involve fast-paced work, quotas, or assembly line work (Tr. 63-64). Any contact with the public should be brief and superficial (Tr. 64).

The VE testified that such an individual could not perform Plaintiff's past relevant work (*Id.*). But, the individual could perform other jobs in the national and regional economy: inspector and food preparation worker (*Id.*). The VE explained that a typical employer for such jobs would tolerate one absence a month (Tr. 65). The VE next stated that both jobs include an at will sit or stand option, but would allow for no more than normal scheduled breaks (Tr. 65-66).

### D. *Plaintiff's Claim of Error*[8]

Plaintiff challenges the ALJ's evaluation of the medical evidence, and argues that the ALJ failed "to include [] all of the resulting limitations of Plaintiff's mental health impairments in his RFC" (Dkt. No. 16 at p. 11).[9] This Magistrate Judge disagrees.[10]

---

[8] Plaintiff also suggests that the ALJ erred in his evaluation of Plaintiff's credibility. But, he does not substantiate this argument; rather, he recites precisely the same portions of medical evidence – primarily using the same language – which he uses to argue error in the ALJ's RFC (Dkt. No. 16 at pp. 8, 11 (CM/ECF)). As such, this Magistrate Judge deems the purported credibility argument waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones.").

[9] All page numbers refer to CM/ECF pagination.

[10] Subsequently, Plaintiff claims, the ALJ's hypothetical to the VE – which incorporated each element of the ALJ's RFC's mental limitations – was flawed. Because this Magistrate Judge finds that substantial evidence supports the mental limitations in the ALJ's RFC, the argument need not be addressed.

"[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" and make their own independent medical findings. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990); *see also Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) (an "ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence" (citing, *McCain v. Dir., Office of Workers Comp. Programs*, 58 Fed. App'x. 184, 193 (6th Cir. 2003)). Plaintiff argues that in evaluating his mental limitations, the ALJ violated this principle (Dkt. No. 16 at p. 9).

Plaintiff does not cite to any medical opinion or specifically identify what limitation the ALJ failed to include, and no treating physician rendered an opinion on Plaintiff's mental limitations. But, two consultative medical sources did: Dr. Dickson opined that Plaintiff was mildly impaired in his ability to understand, attend to, remember, and carry out instructions; and, moderately impaired in his ability to appropriately respond to coworkers and supervisors and adapt to change and stress in the workplace (Tr. 396). He concluded that Plaintiff's psychological condition would moderately impair his ability to perform work related activities (*Id.*). Dr. Kriauciunas came to similar conclusions: Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and, respond appropriately to changes in the work setting (Tr. 407-08). Ultimately, Dr. Kriauciunas found that Plaintiff's functioning was adequate when not engaging in full blown alcohol use, and opined that he was capable of performing simple, repetitive work on a sustained basis (Tr. 410).[11]

---

[11] Plaintiff often denied alcohol use throughout the relevant time period.

The regulations mandate that "the [ALJ] must explain . . . the weight given to the opinions of [] State agency medical or psychological consultant[s] . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources[.]" 20 C.F.R. § 416.927(e)(2)(ii). Thus, the ALJ must weigh the opinions of medical sources such as Dr. Kriauciunas and Dr. Dickson, and elaborate his reasoning for that weight while mindful of the factors utilized in the evaluation of treating physicians' opinions: among them, the supportability and consistency of the opinions, and the sources' respective specializations. 20 C.F.R. § 416.972(c); *see, e.g., Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), reh'g denied (May 2, 2013); *Sparck v. Comm'r of Soc. Sec.*, No. 11-10521, 2012 WL 4009650, at *9 (E.D. Mich. Aug. 23, 2012) (although the ALJ reserves the right to decide a claimant's RFC, he must rely on medical opinions to support his conclusions regarding a claimant's mental and cognitive limitations).

Here, the ALJ referred to each opinion in his decision, but did not state the weight he afforded to each or discuss the factors outlined in *Gayheart* (Tr. 29, 34).[12] And "[w]hile it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that: '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky*, 167 F. App'x at 507 (6th Cir. 2006) (internal citation omitted). "The fundamental question . . . is whether the ALJ's decision is supported by substantial evidence." *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x

---

[12] With respect to opinion evidence, the ALJ simply stated: "[in making this finding, t]he undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p" (Tr. 31). The ALJ discussed the findings of Dr. Dickson (Tr. 34); and mentioned that he had considered Dr. K's opinion in his evaluation of Plaintiff's limitation in concentration, persistence, and pace (Tr. 29).

463, 468 (6th Cir. 2004). Because it is, the ALJ's error – if any – is harmless. *See id.*, 112 F. App'x at 468 ("Logically, then, if the refusal to even acknowledge the opinion of a treating physician was harmless error in *Heston,* then the ALJ's failure in the present case to discuss thoroughly the opinion of a consultative examiner does not warrant reversal.").

The ALJ incorporated significant mental limitations into Plaintiff's RFC, consistent with both opinions: Plaintiff was limited to simple, repetitive work that does not involve more than 1- and 2-step tasks in a low stress environment (i.e., no fast-paced work, no work that involves quotas, and no assembly line work); and, he could not work in close proximity to others, or perform work that involves more than brief and superficial contact with the public (Tr. 30). *See, e.g., Osacar v. Colvin*, CV-12-5040-LRS, 2013 WL 5491899, at *5 (E.D. Wash. Oct. 1, 2013) (an RFC that precluded more than superficial contact with the general public was consistent with a medical opinion that claimant had marked limitations in her ability to interact with the general public).

And, while Dr. Kriauciunas opined that Plaintiff had a moderate limitation in concentration, persistence, and pace – and Dr. Dickson made no such finding – such a limitation is not inconsistent with the mental limitations in the ALJ's RFC. *See e.g., Sutherlin v. Comm'r of Soc. Sec.,* No. 10-10540, 2011 WL 500212, at *2 (E.D. Mich. Feb.8, 2011) ("[T]he administrative law judge was not required to incorporate the broad terminology of the [moderate CPP limitations] verbatim. Rather, as required, the administrative law judge carefully considered and evaluated the credibility of all the relevant evidence when making the residual functional capacity determination and transforming [Plaintiff's] restrictions into concrete terms"); *Hess v. Comm'r of Soc. Sec.*, 07-13138, 2008 WL 2478325, at *7 (E.D. Mich. June 16, 2008) ("Taken in isolation, the hypothetical limitations consisting of '[s]imple routine tasks in a low stress

environment' and 'minimal changes in the work place setting' might appear inadequate to account for 'moderate' concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of "moderate" limitations findings are not incompatible."); *see Sutherlin,* 2011 WL 500212, at \*\*1, 3 (where the state agency doctor found that the claimant suffered moderate difficulty in maintaining concentration, persistence, or pace and ultimately concluded that the claimant retained the ability to perform one- to two-step tasks on a sustained basis, the ALJ's RFC was sufficient because it described the effect of the limitation in concrete terms, namely: (1) minimal contact with the public; (2) able to work in proximity to, but not collaboratively with, other people; and, (3) limited to one- to two-step work tasks). Moreover, Dr. Kriauciunas concurrently opined that Plaintiff was capable of performing repetitive, simple tasks on a sustained basis. And, although Plaintiff reported that he had trouble focusing on television programs, the ALJ noted that Plaintiff reported enjoying reading and stated that "observations by consultative and treating mental health professionals do not demonstrate more than moderate deficits of functioning in the area of concentration, persistence or pace" (Tr. 30).

The record provides further support for the mental limitations in the ALJ's RFC. For example, the ALJ mentioned that although Plaintiff had presented with a depressed mood and labile or constricted affect during the relevant time period, he had been friendly and cooperative with medical providers; reported improvement in his mood while on medications, without any significant side effects; and – although having a history of psychiatric hospitalizations for suicidal attempts or ideations – presented no documented evidence of hospitalizations or emergency room visits for psychiatric episodes during the relevant time period (Tr. 33). In May of 2009, Plaintiff also told his therapist that he felt better after performing some odd jobs around

his home; his therapist noted that "[he] appears to need something to do during the day. He really wants to do some work that he is paid for but doesn't want to do anything to affect his Social Security disability appeal" (Tr. 359-61).

In sum, the ALJ did not rely on "his own medical judgment" to determine Plaintiff's RFC. *Meece*, 192 Fed. App'x. at 465. Although the ALJ did not explicitly address the weight given to either relevant medical opinion, his RFC determination adequately accounted for all of Plaintiff's mental limitations as opined by consultative sources – including a limitation in concentration, persistence, and pace – and is otherwise consistent with the record as a whole. *See Collins v. Comm'r of Soc. Sec.*, 357 Fed. App'x. 663, 670 (6th Cir.2009) (the ALJ's RFC determination must be supported by substantial evidence, which may include opinion evidence by a consultative examiner, opinion evidence by a state agency physician, treatment records, and the claimant's testimony ). Substantial evidence supports the mental limitations in the ALJ's RFC, and his decision should not be disturbed on appeal.

## IV. CONCLUSION

Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of sa copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*,

638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

> s/Mark A. Randon
> Mark A. Randon
> United States Magistrate Judge

Dated:  December 30, 2013


### Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, December 30, 2013, by electronic and/or ordinary mail.

> *s/Felicia Moses for Eddrey Butts*
> *Case Manager for Magistrate Judge Mark A. Randon*